UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF FLORIDA

FORT LAUDERDALE DIVISION

CASE NO. 20-61206-CIV-RKA

ANUEL ST. CLAIR, . Fort Lauderdale, Florida
. November 10, 2020
Plaintiff, . 1:29 a.m.
.
v. .
.
USHEALTH ADVISORS, LLC, .
.
Defendant. .
. . . . . . . . . . . . . . . .

- - - - -

Transcript of Telephonic Motion Hearing had

before the Honorable Roy K. Altman,

United States District Judge.

- - - - -

Proceedings recorded by mechanical stenography, transcript produced by computer.

APPEARANCES:

For the Plaintiff: Andrew J. Shamis, Esq.
Shamis & Gentile, P.A.
14 NE 1st Avenue
Suite 1205
Miami, Florida 33132

For the Defendant: Jeffrey A. Backman, Esq.
Gregg Strock, Esq.
Roy Taub, Esq.
Greenspoon Marder, P.A.
200 East Broward Boulevard
Suite 1500
Fort Lauderdale, Florida 33301

Court Reporter: Francine C. Salopek, RMR-CRR
Official Court Reporter
United States District Court
299 E. Broward Blvd., Room 207B
Fort Lauderdale, Florida 33301
(954)769-5686

\- - - - -

**TUESDAY, NOVEMBER 10, 2020, 1:29 P.M.**

*(The Judge entered the teleconference)*

THE COURT: Hi, Fran.

THE COURT REPORTER: Hi, Judge.

We are here for the case of Anuel St. Clair vs. USHEALTH Advisors, LLC, Case Number 20-Civil-61206. Counsel are online, Judge.

THE COURT: All right, folks. Good afternoon.

Who's here for the plaintiff?

MR. SHAMIS: Good afternoon, Judge. This is attorney Andrew Shamis on behalf of the plaintiff.

THE COURT: Good afternoon to you.

And who's here for the defense?

MR. BACKMAN: This is Jeff Backman. Also on the line is Gregg Strock and Roy Taub for the defendant, USHEALTH Advisors.

THE COURT: Good afternoon to all of you.

All right. So remember just a couple of easy ground rules. Please speak clearly and slowly into your phone so that Fran, my court reporter, can take down everything you say. And, second, please always state your name and identify the party that you represent any time you're going to speak. It's the only way for Fran to know who's speaking and to take an accurate transcript of today's hearing.

So the reason I called you in for a status is, I

looked at the case, it's a TCPA punitive class action filed in June. There's an amended complaint filed in August, three counts under the TCPA. The defendant answered, asserted affirmative defenses, and filed a motion to dismiss in November for lack of subject matter jurisdiction. The mediation deadline isn't until May.

Let me ask, from the defendant's perspective, if I dismiss this case, does it just proceed in state court?

MR. BACKMAN: No. The 12(b)(1) subject matter jurisdiction issue that's raised in the motion we just filed is slightly different than the one you've probably seen in the past. This is a motion that's based upon the Supreme Court's decision toward the end of the summer -- end of last spring, the beginning of the summer in the *Barr vs. American Association of Political Consultants* case, where the Supreme Court declared that this section of the statute, one of the sections that form the basis of the plaintiff's cause -- complaint here, was declared unconstitutional, because it included the government debt exception that I'm sure the Court is familiar with it.

THE COURT: I've read the case.

MR. BACKMAN: Correct. So there have been two decisions following the *Barr* Supreme Court ruling -- one, *Creasy* out of Louisiana, and one, *Linderman (sic)* out of a district court in Ohio -- that have considered the very issue

that is framed by the motion we just filed, which is whether or not the statute being declared unconstitutional with the government debt exception deprives this Court of subject matter jurisdiction since this section of the statute at issue in this case is void as unconstitutional during the time period that the Supreme Court has declared that it was, in fact, unconstitutional. So that is the argument here.

So if there is -- if the Court were to agree with *Creasy* and *Linderman* and the arguments raised by our motion, this case would go away, because the section of the statute deprives the Court not just of subject matter jurisdiction, but it was unconstitutional. So the plaintiff couldn't bring it in state court either.

THE COURT: Wouldn't that be as to Counts 1 and 2 only, or is it to all three counts?

MR. BACKMAN: It would be as to one and two only, this particular argument. Count 3 would be the internal do-not-call claim, which would proceed separately.

THE COURT: Okay. So --

THE COURT REPORTER: Excuse me. Who's speaking on --

MR. BACKMAN: I apologize. This is Jeffrey Backman for the defendant.

THE COURT REPORTER: Okay. Thank you.

THE COURT: Even if you prevail on the motion to dismiss, then this case still goes forward on Count 3, is that

correct?

MR. BACKMAN: I believe that's correct, yes, if the plaintiff wants to proceed. That's an entirely different case as we see it, but, yes.

THE COURT: Well, let me ask the plaintiff. What's your view of the motion to dismiss and would you want to proceed on Count 3 only if I granted the motion to dismiss Counts 1 and 2?

MR. SHAMIS: So -- I'm sorry. Andrew Shamis on behalf of the plaintiff.

So let me address first, you know, the motion to dismiss, and this very creative argument that has somehow gained tracks in a couple courts, which is essentially saying the Supreme Court ruling is not what the Supreme Court ruled. I do applaud the creativity in that argument. And, again, two courts have picked it up. So, unfortunately, it's become something that the plaintiff's bar has had to respond to. But I think the argument is incorrect. And I don't think that the Court should grant the motion just based on that.

Assuming -- if the Court were somehow inclined to grant the motion to dismiss on that, we would absolutely still proceed under Count 3. But, again, you know, I don't think this is -- this argument really has any merit. And I think that's shown throughout kind of the defense bar and how they've handled this. When the first decision or the first order came

down on *Creasy*, not that many people really did anything, but as soon as the second order came out in Ohio, now the brief is being filed everywhere.

THE COURT: Are there any district court judges who have gone the other way?

MR. SHAMIS: No, I don't believe so. I had a case in Texas that it was pending, but we've settled it. I have not been involved in any case that it's been granted, and I expect and the plaintiff's bar expects to win most of these hearings. It appears to be one of those motions that, you know, maybe wasn't taken that seriously, and it's gained a little bit of traction. But, you know, I know that my team has fully briefed this issue in other cases with the exact same issue really heavily, and, you know, we would fully expect to win that.

THE COURT: How much of a difference -- Mr. Shamis, how much of a difference does it make damages-wise in the case if you're proceeding with one and two and three versus just three?

MR. SHAMIS: So in this particular case, it could be a huge difference in damages. So this is a case where it's a prerecorded message. So prerecorded messages aren't going to be wiped out by the state court issues going on in the Supreme Court. That's going to have no bearing. So this is -- and it's our belief that they don't have proper consent for anyone that they were sending out these prerecorded messages to.

And so to only proceed under, you know, the internal DNC claims is a huge, huge, huge hit to potential damages. And, to be frank, I think it's letting the defendant get off the hook on a lot of liability that, you know -- there's no mystery you got to have prior such written consent to send prerecorded messages. I mean nothing --

THE COURT REPORTER: Excuse me, Mr. Shamus.

THE COURT: You're speaking very fast, and I sometimes can't even understand the words. So you have to imagine that she's going to have a tough time typing it up.

MR. SHAMIS: Apologies. I'll speak a little slower.

So this is a prerecorded message case. And so because it's a prerecorded message case, to take out -- you know, it's going to be our opinion that every prerecorded message that was sent out that the defendant doesn't have consent for. So to wipe out Counts 1 and 2 in this particular matter is a huge deal. I understand in some cases it's not the biggest deal on damages, but on this one, that's going to have a huge impact on the case.

THE COURT: Give me a sense of what we're talking about numbers-wise.

MR. SHAMIS: I don't know the numbers. We don't have class data yet on this. But just from my experience in the many TCPA cases I've done, when you deal with an internal revocation class, you're dealing with a fraction of the total

class, somewhere between ten and 20 percent of the total overall damages, maybe less.

THE COURT: Got it. So this order could theoretically cut damages by as much as 70, 80, 90 percent.

MR. SHAMIS: Absolutely.

THE COURT: Understood.

Okay. All right. So let me ask, then, before I get to adjudicating the motion, which, of course, we won't do today, whether the parties have expressed an interest in trying to resolve the case with one another or whether that's just unfeasible now until I rule on the motion.

I'll hear from the plaintiffs on that first.

MR. SHAMIS: Andrew Shamis again on behalf of the plaintiff.

So we do have mediation scheduled. Without trying to turn the issue to what's in front of the Court right now, the defense and I are having some issues on really establishing that the defendant is the one who sent these particular messages at issue. So while we have mediation set, and while we've been conducting discovery and meet and confers on that issue, the defendant has not come out and said that we sent these messages. And so I have a strong opinion that I don't think -- I mean without putting words in their mouth, I don't see this getting resolved until that issue has been cleared up.

THE COURT: Well, why isn't that just a simple issue

to get cleared up?

MR. SHAMIS: It should -- to be perfectly honest, your Honor, it should be. We've sent multiple rounds of discovery, multiple meet and confers. It's our opinion that the defendant is not being forthcoming, and they're not providing any information as to their marketing partners. We conducted another meet and confer on -- yesterday on this exact issue. And, you know, we have a prerecorded message here where it says, you know, press three to get on the list to receive a call back from a USHEALTH advisor licensed agent, and defense counsel and defendant will not tell us who their marketing partners are. They're just saying, "We didn't send the message," and that's where it stops.

THE COURT: Okay. Let me hear from the defense on those two points. One, the likelihood of resolving this case, and, two, why we can't seem at least to get agreement on who sent these messages so we can move on with the case.

MR. BACKMAN: Sure. No problem.

This is Jeffrey Backman for the defendant.

As to an early resolution or moving forward with the mediation, we're happy to have some sort of individual settlement dialogue. I believe we've expressed that to Mr. Shamis in the past. But there is no dispute as to whether or not USHEALTH Advisors made the telephone call that they allege that USHEALTH Advisors made in the complaint. USHEALTH

Advisors did not make that telephone call. And the reason why Mr. Shamis believes that there's some sort of dispute is simply because USHEALTH Advisors have said, in response to sworn interrogatory responses, that it did not make the telephone calls, and it does not know who did. That Mr. Shamis has not engaged in the discovery that he may need to engage in, in order to identify the caller, and I guess try to connect that caller to USHEALTH Advisors somehow, is not USHEALTH Advisors' fault. And it's not our job to do that discovery for him.

THE COURT: I'm just -- thank you. I'm just a little confused by that answer.

So as I understand, the call message said, click whatever to get on the phone with a USHEALTH Advisors agent, which unless someone's out there doing this totally rogue, someone contracted with USHEALTH Advisors to make this call. So balancing the equities, it would seem easier for USHEALTH Advisors to tell the plaintiffs who that was so that USHEALTH Advisors maybe could be dropped from the case, and the complaint can be amended against a new person? Or entity? But why can't we get to that point? What's the --

MR. BACKMAN: Sure. Again, this is Jeff Backman.

It's not -- there's nobody for us to tell them who made the call, because we have no idea who made the call. And believe it or not, your Honor, you may have seen it in some of the other cases before you, but there are rogue marketers out

there all of the time who do whatever they want to do to try to generate leads and then sell those leads to people.

I will tell you this, there are four caller ID numbers that the plaintiff identifies in his amended complaint; USHEALTH Advisors has done research into those caller ID numbers internally and has found no record of the use of those caller ID numbers. USHEALTH Advisors has looked for Mr. St. Clair, has looked for his telephone number and conducted the research it needs to do internally to try to identify whether it or anyone it knows was associated with calling Mr. St. Clair prior to this lawsuit, and it has found nothing. And we have disclosed all of that information to them.

So is it possible that there's some third-party marketer out there trying to sell leads to USHEALTH Advisors or individuals throughout the country that might sell health insurance products of USHEALTH Advisors? I guess that's possible. But we have not -- my client has not identified who that is for this case.

THE COURT: Does USHEALTH Advisors contract with any third-party company to make calls of this nature?

MR. BACKMAN: Not to make calls like the one in the complaint, no.

THE COURT: To make calls at all?

MR. BACKMAN: I have to find out. I've represented

USHEALTH Advisors for a number of years, and the substantial majority of the third-party lead generators that I'm aware of are all Internet-based opt-in leads, not outbound telephone calls.

THE COURT: Okay. That's a substantial majority. Is there at least one that is not?

MR. BACKMAN: I have to speak to the client and figure that out. But I know that they looked into these particular calls and these particular voice messages, and they don't know anything about them.

THE COURT: Right. Well, that makes sense, right? If USHEALTH Advisors isn't the one that made the call, then looking through USHEALTH Advisors' databases for these calls is kind of a fool's errand. But if there's a telemarketing company or lead generator that USHEALTH Advisors contracted with that made these calls, then the proper course, it seems to me, would be to look through that third-party entity's logs to see if Mr. St. Clair's number or any of those caller ID numbers appear there.

But --

MR. BACKMAN: Right -- oh, I apologize.

THE COURT: No, no, you go ahead.

MR. BACKMAN: Yeah, this is Jeff Backman again.

What I understand is that the client has actually looked to see if any of its third-party lead generators were

making these calls that were alleged to have been made in, I don't know, earlier -- early 2020 to Mr. St. Clair, and they have not found any of that information.

THE COURT: I see. So you're representing --

MR. BACKMAN: The client has actually gone into some depth, from what I understand. But I'm happy to have an additional conversation and find out if they have anybody that makes outbound calls or did during the time period at issue.

THE COURT: Let me just understand. What you're representing to the Court is that not only has USHEALTH Advisors run a search through its own database to see, on the one hand, the outgoing side, whether the caller ID numbers are present, but also on the other end, the incoming side, whether Mr. St. Clair or any numbers associated with him in the complaint are in the USHEALTH Advisors database. And that resulted in no leads.

But in addition to that, USHEALTH Advisors has gone to all of the companies that are third-party phone call lead generators that it contracts with and done the same two-step analysis, outgoing and incoming, with each and every one of those third-party call generator companies and found nothing there as well? You're representing all of that today?

MR. BACKMAN: No, your Honor, I can't make that representation. And if that's what you took from what I said, then I -- I don't believe that that's what I said, but

apologize for the misunderstanding.

THE COURT: No, no problem. So which part there was I mistaken about?

MR. BACKMAN: The first two parts clearly were rearticulated the way that I believe that I articulated them. The last part, in terms of the third-party lead generators, what I believe -- and I will happily verify, because I'm not -- well, what I believe is that the client has tried to figure out whether anyone was making these telephone calls. Any of the third-party lead generators that it utilizes, whether they were making these telephone calls that are alleged in this complaint. And I believe the client has determined that, no, the answer to that question is no.

But, no, I don't believe the client has gone to all of its various third-party lead generators and had them conduct various searches for telephone numbers and things. I don't think the client could make them do that even if it wanted to.

THE COURT: Now I'm confused. So what's the difference between what I said and what you just said? In other words, how does it verify that the third-party lead generators haven't made this call unless it verifies with the third-party lead generators that they haven't made this call?

MR. BACKMAN: This is Jeff Backman again.

All the client could do is simply determine whether or not there were any third-party marketers out there making

outbound telephone calls like this. But the client can only do that on its own internal investigation. It is not aware of any of the third-party lead generators it uses making these types of telephone calls.

THE COURT: Do we have a list of the third-party lead generators that it uses?

MR. BACKMAN: I do not have that list, no.

THE COURT: Does the client have the list?

MR. BACKMAN: I'm sure it does.

THE COURT: How many would you say it is?

MR. BACKMAN: More than a dozen probably? But, again, my knowledge is limited to opt-in, you know, online consent-based leads being purchased.

THE COURT: Okay. But don't you think it would help matters -- I mean your interest, of course, is in getting USHEALTH Advisors out of the case, and -- I mean the plaintiff's lawyer's interest is desperately to get USHEALTH Advisors out of the case if, in fact, USHEALTH Advisors have nothing to do with this, I would think.

So don't you think that the two of you have aligned interests in this regard? If everything you're saying is true, the two of your interests are totally aligned. And the best way to get exactly what both of you want is put a list together of a dozen companies on an Excel spreadsheet and email it over today and say, Here it is, this is the list. And then, you

know, you could have column one, the company name, the third-party lead generator's name; column two, the date range when the contract was in place; and, column three, whether they make this sort of outgoing call that we're talking about in this complaint, yes or no. And send it over to the plaintiff and let the plaintiff conduct discovery on that.

But this like game of let's wait and see if the plaintiff's lawyer happens to whack-a-mole the right verbiage for the appropriate question in the dark, we're going to be here a year from now and still have gone nowhere, it seems to me.

MR. BACKMAN: This is Jeff Backman.

Well, I mean -- the problem with that is the plaintiff filed a lawsuit. The plaintiff files a lawsuit and based upon information and belief tries to connect it back to USHEALTH Advisors. The plaintiff has no other information.

We've even asked the plaintiff whether these are ringless voicemails, like the *Grigorian* case out of Judge Cooke's division that's pending before the Eleventh Circuit. And he tells us -- counsel tells us, "Well, we're not sure." So even the plaintiff himself, through counsel, doesn't have any knowledge with respect to what types of calls these were -- ringless voicemails, prerecorded messages.

There's no allegation that he called any of the numbers back. There's no allegation that they've conducted

research on the CID numbers or the number that's in the message and somehow tied that back to my client. And now they want us to disclose every single third-party lead generator with whom we've done business over an entire class period in the hopes that they could somehow identify if not this class, maybe some other class.

And that's the problem that we see with the types of discovery requests that we're receiving from them. They asked us if we made these calls, we said no.

THE COURT: All right. Let me ask the plaintiff's lawyer. What I just proposed, a list of the lead generators, would that be helpful to you?

MR. SHAMIS: Andrew Shamis on behalf the plaintiffs.

Yes, it would, your Honor. And, in fact, in my meet-and-confer letter we sent over, that is the exact request that we've sent to them. All we have is a prerecorded message saying, "This is USHEALTH Advisors."

It couldn't be more clear. Defendant is playing a game about who sent it, and then they won't disclose the third-party marketers. This has been exactly what we've been dealing with the entire length of the case, is what you just heard.

THE COURT: All right. I order the defendant to produce that document, that list. How much time do you need, Mr. Backman?

MR. BACKMAN: Is there a time period for which we have to identify the lead vendors that we've been associated with?

THE COURT: What's the time period of the complaint, Mr. Shamis?

MR. SHAMIS: The time period of the complaint is any calls within the last I believe four years. But the call occurred in -- if I can give you the exact date, I have it in front of me, just bear with me one second -- apologies -- the call was received on April 1st, 2020.

THE COURT: Okay. So how about from April 1st, 2019, to April 1st, 2020?

MR. SHAMIS: That's sounds fine to me, your Honor.

Andrew Shamis.

THE COURT: Mr. Backman, how about that? April 1st, 2019, to -- why don't we say April 2nd, 2019, to April 2nd, 2020, in case there's a time change issue that we're butting up against?

MR. BACKMAN: Your Honor, this is Jeff Backman.

I mean you've ruled. I'm not going to -- I mean there's not much I can do about that particular ruling at this time. If that's the time period that you want us to make those disclosures, and that's what you're ordering us to do, and I understand your ruling. But if I could, if I could just say a couple of things in that regard.

If we knew who the lead generator was, we would

disclose it. If we knew who was making these calls, we would disclose it. The last thing we want is precisely what it is that you just ordered, which is opening the entirety of the relationships that USHEALTH Advisors has with its third-party lead generators. I mean none of them, as far as we could tell, have anything to do with this case. And so now we're being ordered to produce a year's worth of --

THE COURT: You don't know that.

MR. BACKMAN: -- contractual relationships --

THE COURT: You don't know that. You see, what happens here is, you say one thing, which is, they definitely have nothing to do with this case. Then I say, Oh, okay, you've verified that they have nothing to do with this case. And you say, Oh, Judge, you are hearing things, Judge. You have completely misunderstood what I've just said, and I apologize for any confusion, Judge. And there's nothing I just said, none of the words in English that have come out of my mouth would even have suggested to a mildly intelligent person that I just said that we verified that these people have nothing to do with this case. All I'm saying, Judge, is that these people have absolutely nothing to do with this case.

So you see the circular logic of what you're saying makes no sense to the plaintiff's lawyer. And sometimes plaintiffs' lawyers are purposefully obtuse, but it makes no sense to me either. And my job, of course, is to move this

case along. My job is to make sure that a year from now, we're not playing the same game of cat and mouse. My job is, on behalf of what's happening here, to make sure that if you're a hundred percent right, which is that your company has nothing to do with this, that your company gets the heck out of this case as quickly as we can get it out. And that's only ever going to happen if the plaintiff knows who actually made the calls and lets you out in turn.

But the plaintiff can't be forced to take you at your word. A plaintiff can't say, Okay, Mr. Backman, you seem like a really honest guy, and I'm just going to take you at your word that your client and its third-party contractors had nothing to do with these calls. You can't do that. That's not what litigation is about. Litigation is they don't believe anything they say. You don't believe anything they say. And so when you can't agree voluntarily to turn over the things each other needs, I order one side or the other to do that.

So if you're telling me you want me to order them to give you more information about the kind of calls that it was to help you and your third-party lead generators make the call, I'm happy to do that. Because I'm happy to do things that are going to facilitate both sides getting to a point where they either litigate this thing on the same plane, or one party gets out of the case and the appropriate party is substituted in. But not this like endless game of whack-a-mole, where we're in

a litigation that you say is against the wrong party, and they say may well be against the wrong party, but you have no -- you haven't helped me find the right party, so what I'm going to do?

So that's why I'm ordering you to produce something simple, and I'm happy to order them to produce something simple to move the case along, if that's what you want.

MR. BACKMAN: Well, I'd like to know from them what the source of this call was. Who called them? I mean what information do they have about the telephone call?

What you've ordered us to do, your Honor -- this is Jeff Backman -- what you've ordered us to do is simply provide them with a list of third-party lead generators with whom my client has done business over the course of a year. That is not going to tell them who made this call. We don't know who made the call.

So what happens next? They send subpoenas to every third-party lead generator --

THE COURT: Excuse me. It's not going to tell them who made the call. It's only going to give them a source of a dozen companies, according to what you said, a dozen companies who may well have made the call. And then it's on them, as you say. I mean then it's their job to issue subpoenas to those companies and to try to get those companies to conduct searches.

MR. BACKMAN: But -- this is Jeff Backman -- my concern is that we're going to end up in a situation where, however many companies it is, they're going to -- the plaintiff is now going to send these overly broad, all-inclusive third-party subpoenas for all of these records that would be in the possession of these third-party lead generators for leads that they may have been procuring from my client completely unrelated to this singular prerecorded voice message that they've identified in their complaint.

THE COURT: One question for one set of documents: Did you make this call?

MR. BACKMAN: I hope so, but I don't know if that's what Mr. Shamis is going to do with all of the information that we've been ordered to provide him.

THE COURT: I mean --

MR. BACKMAN: I've seen it instituted in other cases --

THE COURT: Mr. Shamis, is that not the only question that needs to be asked, at least at the beginning? "Are you the person that made this call?" If they're not, then that's the end of it. If they are, then you substitute them in for USHEALTH Advisors, unless you can prove that the two of them were conspiring together to make the call.

MR. SHAMIS: This is Andrew Shamis.

Without fully committing to that being the only

question, I'm not -- I'm totally agreeing that we're not going to send some overbroad subpoena asking for all these documents. I want to know, did you send the call, did you send prerecorded or RVM messages, you know, to this number? I mean it's going to be very simple. It's not going to be a, you know, give me all contract data you have with USHEALTH from now -- you know, it's not going to be any type of that kind of subpoena. I don't want to deal with going through 15 companies' subpoena responses with all that information that is irrelevant.

THE COURT: Why don't we just keep it simple? Why don't we say that within, I don't know, however long it takes, let's say one week, USHEALTH Advisors will provide that list to the plaintiff. Within one week after that, the plaintiff will send a one-question subpoena to all 12 or 15 or however many it is of those companies. And then when the plaintiffs have gotten their response, they can file with the defense a joint notice with the Court -- or a straight motion for the Court asking me to set another status conference, which hopefully will be no later than early December, and we can figure out where we are at that point? Did you find out who it was? Did you get the information that you needed? What else do you need? And from the defense, what do you need? If you need more information from the plaintiff, tell me what it is, and I'll order them to provide it.

How about a schedule like that, that allows us to keep

tabs of what's going on with the case? Mr. Shamis?

MR. SHAMIS: This is Andrew Shamis.

That would be fantastic, and I really appreciate the assistance.

THE COURT: From the defense, Mr. Backman, is there anything -- since we're going to do this game for a month, is there anything you want me to have them provide to you in that period that can help you move the case along?

MR. BACKMAN: We would like to know if these are ringless voicemails or not. That's something they should know.

THE COURT: Okay. Mr. Shamis, do you know the answer to that?

MR. SHAMIS: I believe -- Andrew Shamis on behalf of the plaintiff -- I believe it's a prerecorded message and not a ringless voicemail. But it's really difficult to tell without seeing the data from the phone end. As you know -- well, I'm not sure if you know, but they both come across in your voicemail, but unless you actually hear it ring, unless you actually have the call come through, it's a little difficult to tell. And, actually, there are some times that RVMs, even though it's not supposed to ring, it sometimes will ring and have a phone number come through. So it's really hard to tell at this stage. But we think it's a prerecorded, not an RVM.

THE COURT: Is there more information than that that you want, Mr. Backman? Because I'm happy to make him provide

it.

MR. BACKMAN: Well, it just seems to -- this is Jeff Backman -- it just seems to me that this is information that his client should know. Did his phone ring? Did he just wake up one day and have a voicemail? He can look at his client's phone. I mean a lot of the same questions that are being asked of me from my client I think could be asked from him and his client with respect to what this call was on the receiving end. They certainly make a whole bunch of allegations in their complaint about how, you know, destructive and damaging and injurious this was to him in order to have a standing claim, but they can't identify whether it is, in fact, a ringless voicemail or not. I find that strange.

THE COURT: Well, he's saying that his client told him, that's as I understand it, that it was a prerecorded voicemail -- prerecorded call and not a ringless voicemail. Is that basically what you're saying, Mr. Shamis?

MR. SHAMIS: Andrew Shamis on behalf of the plaintiff.

Yes, because the lay person doesn't really understand the difference between a prerecorded and an RVM. It's a technical issue. And so for the plaintiff, it's a prerecorded message, and it looks like it's still a prerecorded message, but it very well could end up being an RVM. We don't know for sure until we get the data.

THE COURT: What other information do you want me to

ask him to provide to you that would help you make that assessment, Mr. Backman?

MR. BACKMAN: This is Jeff Backman.

I don't know. I don't know the data that he thinks he needs from his client. I mean he has his client's phone. I would imagine he could look at that and be able to identify it.

THE COURT: Tell me how.

MR. BACKMAN: I don't know.

THE COURT: Neither do I. See, that's the thing. That's why the question you're asking of him is nothing like the question that he's asking of you. The question he's asking of you is one that's easily susceptible of an easy answer. There is a list. You will email it. It's on a one-page document. It's very simple. He will then send a one-question subpoena to each of those companies asking whether they made the phone call that's at issue in this case. Very simple.

You're asking a question that he's answered based on what his client remembers, which is I guess probative of something, although his client's not a TCPA lawyer and probably doesn't know what to look for. He's looked at his client's phone, and maybe you want me to have his client give you a screenshot of the phone message on the phone or some other thing that's objective, I'm happy to do. But beyond that, it's not super clear to me what you want him to give you, other than what's in presumably, whoever the caller entity was, their

database, which would show whether it was prerecorded or ringless voicemail.

MR. BACKMAN: This is Jeff Backman.

Your Honor, I'm not the most technically gifted in the world, but the phone itself should have the evidence of whether or not Mr. St. Clair actually received a telephone call and his phone rang or whether or not the phone simply received a voicemail. And if Mr. Shamis has looked at his client's phone, and the information was preserved on it, which I would anticipate it was, then he should be able to tell us or provide us the phone, and a third party could inspect it and determine whether or not a telephone call was ever made by the outbound CIV numbers or from the outbound CIV numbers that they identified in their complaint.

THE COURT: Mr. Shamis?

MR. SHAMIS: Yes. Again, Mr. Shamis -- Andrew Shamis on behalf of the plaintiff.

This goes back to what I just said previously. RVM technology is not all created equal. So you have certain RVM technology which is the high end, it's a Google of RVM, and that RVM technology works perfectly. All of a sudden, a voicemail is slotted into your inbox, and there's no call, there's no ring. It's just all of a sudden, you have a notification. Then there is the bootleg version that many companies use, because they're cheaper. It's knockoff

technology. It's supposed to be an RVM, but you have a call that still goes through, and the voicemail appears in the voicemail inbox.

So what I'm saying is, we have conducted that investigation, and we're unable to tell on our end whether it's for sure an RVM or whether it is a prerecorded message.

THE COURT: I understand that.

MR. SHAMIS: All that we have --

THE COURT: I understand that. But here's the question he's asking. On your client's phone, is there a missed call or not?

MR. SHAMIS: I believe -- yes, there's a missed call -- we have a -- I believe it's a missed call from telephone number (716)268-8751.

THE COURT: All right. Can you email him a screen -- do you have a screenshot of that missed call?

MR. SHAMIS: It's not in my complaint, and I would have to go into my file, but I will certainly look right now. And if I have it, I'll send it over.

THE COURT: If you don't have it in your office, is there a way to get it from your client's phone?

MR. SHAMIS: Yeah, absolutely. If we don't have it, I'll see if the actual screenshot is on my client's phone, and we'll do everything possible to get every last piece of information regarding this particular issue over to Mr. Backman

in the next couple days.

THE COURT: Why don't -- to make my order easy, because we're going to enter a paper order -- Mr. Backman, of course, is going to send you the list one week from today, which is next Tuesday. By that day -- you can do it before, but by that day, you will send him every piece of objective information you have or your client has on this question that he's asked.

MR. SHAMIS: Absolutely.

Andrew Shamis, sorry.

THE COURT: Mr. Backman, is that what you wanted?

MR. BACKMAN: Yeah, that's a good start. Thank you, your Honor.

THE COURT: Okay. What else can I help the parties with?

Mr. Shamis?

MR. SHAMIS: On behalf of the plaintiff, that's where we're at. We need to get over this hurdle before we can really continue to move to the next stage. You know, we do have mediation set, you know, like we said previously, but this --

THE COURT: You never told me.

MR. SHAMIS: It's set right now for May 25th of next year.

THE COURT: Oh, well. Okay. That's way far off. What is that? That's eight months from now or so, seven months

from now. Eight months ago, there was no Coronavirus. The whole world can change between now and then.

MR. SHAMIS: Big difference in eight months, your Honor.

THE COURT: Mr. Backman, anything I can help the defense with at this point?

MR. BACKMAN: Not at the moment. We've got discovery requests out. We anticipate responses in the next couple weeks. And so maybe after that, we might need some help, but hopefully not.

THE COURT: Okay. Great.

So what we'll do is, I will set -- one week from today, like I said, each party will send over the information that I've described. One week after that -- unless you tell me you don't need a full week for that, Mr. Shamis -- you send out one subpoena with one question asking for the information we've discussed to each of the companies on that list. You need a full week for that?

MR. SHAMIS: *(No response)*

THE COURT: It will be a week. One week for that. And then when you get the information in response to those subpoenas, the two parties will file a joint motion for a status conference with me. I'll grant that motion, set it right away, and you all can update me on where we are.

In the meantime, of course, I'll review the motion to

dismiss and probably set a hearing for the same date as the hearing on the status, and that way we can have an argument on the motion to dismiss and resolve whatever problems are outstanding from the discovery that I've ordered today.

Any questions about any of that from the plaintiff?

MR. SHAMIS: None, your Honor. Thank you so much.

THE COURT: Anything else from the defense?

MR. BACKMAN: No. This is Jeff Backman.

No, your Honor. Thank you.

THE COURT: All right, folks. Thanks a lot. Have a good afternoon.

MR. BACKMAN: Thank you, Judge.

*(The Judge exited the teleconference)*

*(Proceedings concluded at 2:08 p.m.)*

\- - - - -

C E R T I F I C A T E

I hereby certify that pursuant to Section 753, Title 28, United States Code, the foregoing is a true and correct transcript from the record of proceedings in the above-entitled matter.

____/s/Francine C. Salopek ____________ 11-18-2020___
Francine C. Salopek, RMR-CRR Date
Official Court Reporter

MR. BACKMAN: [37]
MR. SHAMIS: [27]
THE COURT REPORTER: [4] 3/4 5/20 5/23 8/7
THE COURT: [65]

/

/s/Francine [1] 32/23

1

10 [2] 1/8 3/1
11-18-2020 [1] 32/23
12 [2] 4/9 24/14
1205 [1] 2/3
14 [1] 2/3
15 [2] 24/8 24/14
1500 [1] 2/7
1:29 [2] 1/8 3/1
1st [5] 2/3 19/9 19/10 19/11 19/14

2

20 percent [1] 9/1
20-61206-CIV-RKA [1] 1/4
200 [1] 2/7
2019 [3] 19/10 19/15 19/15
2020 [7]
207B [1] 2/10
25th [1] 30/22
268-8751 [1] 29/14
28 [1] 32/20
299 [1] 2/10
2:08 [1] 32/14
2nd [2] 19/15 19/15

3

33132 [1] 2/4
33301 [2] 2/8 2/11

5

5686 [1] 2/11

6

61206 [1] 3/7

7

70 [1] 9/4
716 [1] 29/14
753 [1] 32/19
769-5686 [1] 2/11

8

80 [1] 9/4
8751 [1] 29/14

9

90 percent [1] 9/4
954 [1] 2/11

A

a.m [1] 1/8
above [1] 32/22
above-entitled [1] 32/22
absolutely [5] 6/21 9/5 20/21 29/22 30/9
according [1] 22/21
accurate [1] 3/24
across [1] 25/17
action [1] 4/1
addition [1] 14/17
address [1] 6/11
adjudicating [1] 9/8
advisor [1] 10/10
ADVISORS [30]
Advisors' [2] 11/8 13/13
Advisors, [1] 3/6
Advisors, LLC [1] 3/6
affirmative [1] 4/4
afternoon [5] 3/8 3/10 3/12 3/17 32/11
agent [2] 10/10 11/13
agree [2] 5/8 21/16
agreement [1] 10/16
aligned [2] 16/20 16/22
all-inclusive [1] 23/4
allegation [2] 17/24 17/25
allegations [1] 26/9
allege [1] 10/25
alleged [2] 14/1 15/11
allows [1] 24/25
although [1] 27/19
Altman [1] 1/17
amended [3] 4/2 11/19 12/4
American [1] 4/14
analysis [1] 14/20
Andrew [12]
answer [4] 11/11 15/13 25/11 27/12
anticipate [2] 28/10 31/8
ANUEL [2] 1/7 3/5
apologies [2] 8/11 19/8
apologize [4] 5/21 13/21 15/1 20/16
APPEARANCES [1] 2/1
applaud [1] 6/15
appreciate [1] 25/3
April [6] 19/9 19/10 19/11 19/14 19/15 19/15
April 1st [4] 19/9 19/10 19/11 19/14
April 2nd [2] 19/15 19/15
aren't [1] 7/21
argument [7]
arguments [1] 5/9
articulated [1] 15/5
asserted [1] 4/3
assessment [1] 27/2
assistance [1] 25/4
associated [3] 12/10 14/14 19/2
Association [1] 4/15
Assuming [1] 6/20
attorney [1] 3/10
August [1] 4/2
Avenue [1] 2/3
aware [2] 13/2 16/2

B

Backman [25]
balancing [1] 11/16
bar [3] 6/17 6/24 7/9
Barr [2] 4/14 4/23
Barr vs. American [1] 4/14
basis [1] 4/17
bear [1] 19/8
bearing [1] 7/23
beginning [2] 4/14 23/19
belief [2] 7/24 17/15
believe [17]
believes [1] 11/2
beyond [1] 27/23
biggest [1] 8/17
Blvd [1] 2/10
bootleg [1] 28/24
Boulevard [1] 2/7
brief [1] 7/2
briefed [1] 7/12
broad [1] 23/4
Broward [2] 2/7 2/10
bunch [1] 26/9
business [2] 18/4 22/14
butting [1] 19/16

C

call [39]
called [3] 3/25 17/24 22/9
caller [8]
calling [1] 12/11
calls [21]
cat [1] 21/2
cause [1] 4/17
certify [1] 32/19
cheaper [1] 28/25
CID [1] 18/1
Circuit [1] 17/20
circular [1] 20/22
CIV [3] 1/4 28/13 28/13
Civil [1] 3/7
claim [2] 5/18 26/11
claims [1] 8/2
CLAIR [7]
Clair's [1] 13/18
class [7]
clear [2] 18/18 27/24
cleared [2] 9/24 10/1
click [1] 11/12
client [23]
client's [8]
Code [1] 32/20
column [3] 17/1 17/2 17/3
column one [1] 17/1
column three [1] 17/3
column two [1] 17/2
committing [1] 23/25
companies [12]
companies' [1] 24/8
company [5] 12/21 13/15 17/1 21/4 21/5
complaint [15]
computer [1] 1/25
concern [1] 23/2
concluded [1] 32/14
conduct [3] 15/15 17/6 22/24
conducted [4] 10/6 12/9 17/25 29/4
conducting [1] 9/20
confer [2] 10/7 18/15
conference [2] 24/18 31/23
confers [2] 9/20 10/4
confused [2] 11/11 15/18
confusion [1] 20/16

C
connect [2] 11/7 17/15
consent [4] 7/24 8/5 8/15 16/13
consent-based [1] 16/13
conspiring [1] 23/23
Consultants [1] 4/15
contract [3] 12/20 17/3 24/6
contracted [2] 11/15 13/15
contractors [1] 21/12
contracts [1] 14/19
contractual [1] 20/9
conversation [1] 14/7
Cooke's [1] 17/19
Coronavirus [1] 31/1
counsel [4] 3/7 10/11 17/20 17/21
Count [4] 5/17 5/25 6/7 6/22
Count 3 [4] 5/17 5/25 6/7 6/22
country [1] 12/16
counts [5] 4/3 5/14 5/15 6/8 8/16
Counts 1 [3] 5/14 6/8 8/16
court [27]
Court's [1] 4/12
courts [2] 6/13 6/16
Creasy [3] 4/24 5/9 7/1
created [1] 28/19
creative [1] 6/12
creativity [1] 6/15
CRR [2] 2/9 32/24
cut [1] 9/4

D
damages [6] 7/16 7/20 8/2 8/18 9/2 9/4
damages-wise [1] 7/16
damaging [1] 26/10
dark [1] 17/9
data [5] 8/23 24/6 25/16 26/24 27/4
database [3] 14/11 14/15 28/1
databases [1] 13/13
date [4] 17/2 19/7 32/1 32/24
deadline [1] 4/6
debt [2] 4/19 5/3
December [1] 24/19
decision [2] 4/13 6/25
decisions [1] 4/23
declared [4] 4/16 4/18 5/2 5/6
defendant [14]
defendant's [1] 4/7
defense [10]
defenses [1] 4/4
deprives [2] 5/3 5/11
depth [1] 14/6
described [1] 31/14
desperately [1] 16/17
destructive [1] 26/10
determine [2] 15/24 28/11
determined [1] 15/12
dialogue [1] 10/22
difference [6] 7/15 7/16 7/20 15/19 26/20 31/3
difficult [2] 25/15 25/19
disclose [4] 18/3 18/19 20/1 20/2
disclosed [1] 12/12
disclosures [1] 19/22
discovery [8]
discussed [1] 31/17
dismiss [9]
dispute [2] 10/23 11/2
district [6] 1/1 1/2 1/18 2/10 4/25 7/4
division [2] 1/3 17/19
DNC [1] 8/2
do-not-call [1] 5/17
document [2] 18/24 27/14
documents [2] 23/10 24/2
dozen [4] 16/11 16/24 22/21 22/21
dropped [1] 11/18

E
early [3] 10/20 14/2 24/19
easier [1] 11/16
easily [1] 27/12
East [1] 2/7
easy [3] 3/18 27/12 30/2
eight [3] 30/25 31/1 31/3
eight months [3] 30/25 31/1 31/3
Eleventh [1] 17/19
email [3] 16/24 27/13 29/15
endless [1] 21/25
engage [1] 11/6
engaged [1] 11/6
English [1] 20/17
enter [1] 30/3
entirely [1] 6/3
entirety [1] 20/3
entitled [1] 32/22
entity [2] 11/19 27/25
entity's [1] 13/17
equal [1] 28/19
equities [1] 11/16
errand [1] 13/14
Esq [4] 2/2 2/5 2/5 2/6
essentially [1] 6/13
establishing [1] 9/17
everywhere [1] 7/3
evidence [1] 28/5
Excel [1] 16/24
exception [2] 4/19 5/3
Excuse [3] 5/20 8/7 22/19
exited [1] 32/13
expect [2] 7/8 7/14
expects [1] 7/9
experience [1] 8/23
expressed [2] 9/9 10/22

F
facilitate [1] 21/22
fact [4] 5/6 16/18 18/14 26/12
fantastic [1] 25/3
fast [1] 8/8
fault [1] 11/9
figure [3] 13/7 15/8 24/19
file [3] 24/16 29/18 31/22
filed [7]
files [1] 17/14
fine [1] 19/12
FLORIDA [5] 1/2 1/7 2/4 2/8 2/11
folks [2] 3/8 32/10
fool's [1] 13/14
forced [1] 21/9
foregoing [1] 32/20
form [1] 4/17
FORT [4] 1/3 1/7 2/8 2/11
forthcoming [1] 10/5
four years [1] 19/6
fraction [1] 8/25
framed [1] 5/1
Fran [3] 3/3 3/20 3/23
Francine [3] 2/9 32/23 32/24
frank [1] 8/3
front [2] 9/16 19/8

G
gained [2] 6/13 7/11
game [5] 17/7 18/19 21/2 21/25 25/6
generate [1] 12/2
generator [5] 13/15 14/21 18/3 19/25 22/18
generator's [1] 17/2
generators [15]
Gentile [1] 2/2
gets [2] 21/5 21/23
gifted [1] 28/4
Google [1] 28/20
gotten [1] 24/16
government [2] 4/19 5/3
grant [3] 6/19 6/21 31/23
granted [2] 6/7 7/8
Great [1] 31/11
Greenspoon [1] 2/6
Gregg [2] 2/5 3/15
Grigorian [1] 17/18
ground [1] 3/18

H
hand [1] 14/12
handled [1] 6/25
happily [1] 15/7
happy [7]
health [1] 12/16
hear [3] 9/12 10/14 25/18
heard [1] 18/22
hearing [5] 1/16 3/24 20/14 32/1 32/2
hearings [1] 7/9
heavily [1] 7/14
heck [1] 21/5
help [7]
helped [1] 22/3
helpful [1] 18/12
here's [1] 29/9
hereby [1] 32/19
Hi [2] 3/3 3/4
high [1] 28/20
hit [1] 8/2
honest [2] 10/2 21/11
Honor [12]
Honorable [1] 1/17
hook [1] 8/4
hope [1] 23/12
hopefully [2] 24/18 31/10
hopes [1] 18/4
huge [6] 7/20 8/2 8/2 8/2 8/16 8/18
hundred [1] 21/4
hurdle [1] 30/18

I

I'll [7]
I'm [24]
I've [7]
ID [5] 12/3 12/5 12/7 13/18 14/12
idea [1] 11/23
identified [3] 12/18 23/9 28/14
identifies [1] 12/4
identify [7]
imagine [2] 8/9 27/6
impact [1] 8/18
inbox [2] 28/22 29/3
inclined [1] 6/20
included [1] 4/19
inclusive [1] 23/4
incoming [2] 14/13 14/20
incorrect [1] 6/18
individual [1] 10/21
individuals [1] 12/16
information [20]
injurious [1] 26/11
inspect [1] 28/11
instituted [1] 23/16
insurance [1] 12/17
intelligent [1] 20/18
interest [3] 9/9 16/15 16/17
interests [2] 16/21 16/22
internal [4] 5/17 8/1 8/24 16/2
internally [2] 12/6 12/9
Internet [1] 13/3
Internet-based [1] 13/3
interrogatory [1] 11/4
investigation [2] 16/2 29/5
irrelevant [1] 24/9
issue [17]
issues [2] 7/22 9/17

J

Jeff [12]
Jeffrey [3] 2/5 5/21 10/19
job [5] 11/9 20/25 21/1 21/2 22/23
joint [2] 24/16 31/22
Judge [12]
Judge Cooke's [1] 17/19
judges [1] 7/4
June [1] 4/2
jurisdiction [4] 4/5 4/10 5/4 5/11

K

keep [2] 24/10 24/25
knockoff [1] 28/25
knowledge [2] 16/12 17/22
knows [2] 12/10 21/7

L

lack [1] 4/5
LAUDERDALE [4] 1/3 1/7 2/8 2/11
lawsuit [3] 12/11 17/14 17/14
lawyer [4] 17/8 18/11 20/23 27/19
lawyer's [1] 16/17
lawyers [1] 20/24
lay [1] 26/19
lead [21]
leads [7]
length [1] 18/21
lets [1] 21/8
letter [1] 18/15
letting [1] 8/3
liability [1] 8/4
licensed [1] 10/10
likelihood [1] 10/15
limited [1] 16/12
Linderman [2] 4/24 5/9
list [13]
litigate [1] 21/23
litigation [3] 21/14 21/14 22/1
LLC [2] 1/10 3/6
logic [1] 20/22
logs [1] 13/17
Louisiana [1] 4/24

M

majority [2] 13/2 13/5
Marder [1] 2/6
marketer [1] 12/15
marketers [3] 11/25 15/25 18/20
marketing [2] 10/6 10/11
matter [6] 4/5 4/9 5/3 5/11 8/16 32/22
matters [1] 16/15
May 25th [1] 30/22
mean [14]
meantime [1] 31/25
mechanical [1] 1/24
mediation [5] 4/5 9/15 9/19 10/21 30/20
meet [4] 9/20 10/4 10/7 18/15
merit [1] 6/23
message [15]
messages [9]
Miami [1] 2/4
mildly [1] 20/18
missed [4] 29/11 29/12 29/13 29/16
mistaken [1] 15/3
misunderstanding [1] 15/1
misunderstood [1] 20/15
mole [2] 17/8 21/25
moment [1] 31/7
month [1] 25/6
months [4] 30/25 30/25 31/1 31/3
motion [19]
motions [1] 7/10
mouse [1] 21/2
mouth [2] 9/23 20/18
move [5] 10/17 20/25 22/7 25/8 30/19
moving [1] 10/20
Mr. [32]
Mr. Backman [10]
Mr. Shamis [15]
Mr. Shamus [1] 8/7
Mr. St. Clair [5] 12/8 12/11 14/2 14/14 28/6
Mr. St. Clair's [1] 13/18
multiple [2] 10/3 10/4
mystery [1] 8/5

N

name [3] 3/21 17/1 17/2
nature [1] 12/21
NE [1] 2/3
Neither [1] 27/9
nobody [1] 11/22
none [3] 20/5 20/17 32/6
notice [1] 24/17
notification [1] 28/24
November [3] 1/8 3/1 4/4
nowhere [1] 17/10
number [8]
Number 20-Civil-61206 [1] 3/7
numbers [13]
numbers-wise [1] 8/21

O

objective [2] 27/23 30/6
obtuse [1] 20/24
office [1] 29/20
Official [2] 2/9 32/24
oh [4] 13/21 20/12 20/14 30/24
Ohio [2] 4/25 7/2
one-page [1] 27/13
one-question [2] 24/14 27/14
online [2] 3/7 16/12
opening [1] 20/3
opinion [3] 8/14 9/22 10/4
opt [2] 13/3 16/12
opt-in [2] 13/3 16/12
order [12]
ordered [6] 20/3 20/7 22/11 22/12 23/14 32/4
ordering [2] 19/22 22/5
outbound [5] 13/3 14/8 16/1 28/12 28/13
outgoing [3] 14/12 14/20 17/4
outstanding [1] 32/4
overall [1] 9/2
overbroad [1] 24/2
overly [1] 23/4

P

P.A [2] 2/2 2/6
p.m [2] 3/1 32/14
page [1] 27/13
paper [1] 30/3
part [2] 15/2 15/6
parties [3] 9/9 30/14 31/22
partners [2] 10/6 10/12
parts [1] 15/4
party [33]
pending [2] 7/7 17/19
people [4] 7/1 12/2 20/19 20/21
percent [3] 9/1 9/4 21/4
perfectly [2] 10/2 28/21
period [8]
person [4] 11/19 20/18 23/20 26/19
perspective [1] 4/7
phone [20]
picked [1] 6/16
piece [2] 29/24 30/6
place [1] 17/3
plaintiff [30]
plaintiff's [7]
plaintiffs [4] 9/12 11/17 18/13 24/15
plaintiffs' [1] 20/24
plane [1] 21/23
playing [2] 18/18 21/2

P

point [4] 11/20 21/22 24/20 31/6
points [1] 10/15
Political [1] 4/15
possession [1] 23/6
potential [1] 8/2
precisely [1] 20/2
prerecorded [21]
present [1] 14/13
preserved [1] 28/9
press [1] 10/9
prevail [1] 5/24
probative [1] 27/18
problem [4] 10/18 15/2 17/13 18/7
problems [1] 32/3
proceed [6] 4/8 5/18 6/3 6/7 6/22 8/1
proceeding [1] 7/17
proceedings [3] 1/24 32/14 32/21
procuring [1] 23/7
produce [4] 18/24 20/7 22/5 22/6
produced [1] 1/25
products [1] 12/17
proper [2] 7/24 13/16
proposed [1] 18/11
prove [1] 23/22
provide [8]
providing [1] 10/5
punitive [1] 4/1
purchased [1] 16/13
purposefully [1] 20/24
pursuant [1] 32/19

Q

question [14]
questions [2] 26/6 32/5
quickly [1] 21/6

R

raised [2] 4/10 5/9
rang [1] 28/7
range [1] 17/2
read [1] 4/21
rearticulated [1] 15/5
receive [1] 10/9
received [3] 19/9 28/6 28/7
receiving [2] 18/8 26/8
record [2] 12/6 32/21
recorded [1] 1/24
records [1] 23/5
relationships [2] 20/4 20/9
remember [1] 3/18
remembers [1] 27/18
reporter [4] 2/9 2/9 3/20 32/24
represent [1] 3/22
representation [1] 14/24
represented [1] 12/25
representing [3] 14/4 14/10 14/22
request [1] 18/15
requests [2] 18/8 31/8
research [3] 12/5 12/9 18/1
resolution [1] 10/20
resolve [2] 9/10 32/3
resolved [1] 9/24
resolving [1] 10/15
respond [1] 6/17
response [4] 11/3 24/16 31/19 31/21
responses [3] 11/4 24/9 31/8
resulted [1] 14/16
review [1] 31/25
revocation [1] 8/25
ring [5] 25/18 25/21 25/21 26/4 28/23
ringless [7]
RKA [1] 1/4
RMR [2] 2/9 32/24
RMR-CRR [2] 2/9 32/24
rogue [2] 11/14 11/25
Room [1] 2/10
rounds [1] 10/3
Roy [3] 1/17 2/6 3/15
rule [1] 9/11
ruled [2] 6/14 19/19
rules [1] 3/19
ruling [4] 4/23 6/14 19/20 19/23
RVM [10]
RVMs [1] 25/20

S

Salopek [3] 2/9 32/23 32/24
schedule [1] 24/25
scheduled [1] 9/15
screen [1] 29/15
screenshot [3] 27/22 29/16 29/23
search [1] 14/11
searches [2] 15/16 22/25
second [3] 3/21 7/2 19/8
section [4] 4/16 5/4 5/10 32/19
sections [1] 4/17
send [15]
sending [1] 7/25
sense [4] 8/20 13/11 20/23 20/25
seriously [1] 7/11
settled [1] 7/7
settlement [1] 10/22
seven [1] 30/25
seven months [1] 30/25
Shamis [28]
Shamus [1] 8/7
shown [1] 6/24
sic [1] 4/24
side [3] 14/12 14/13 21/17
sides [1] 21/22
simple [7]
single [1] 18/3
singular [1] 23/8
situation [1] 23/2
slightly [1] 4/11
slotted [1] 28/22
slower [1] 8/11
slowly [1] 3/19
someone's [1] 11/14
soon [1] 7/2
sounds [1] 19/12
source [2] 22/9 22/20
SOUTHERN [1] 1/2
spreadsheet [1] 16/24
spring [1] 4/13
ST [1] 1/7
St. [7]
St. Clair vs. USHEALTH [1] 3/6
stage [2] 25/23 30/19
standing [1] 26/11
state [4] 3/21 4/8 5/13 7/22
STATES [4] 1/1 1/18 2/10 32/20
status [4] 3/25 24/18 31/23 32/2
statute [4] 4/16 5/2 5/4 5/10
stenography [1] 1/24
step [1] 14/19
stops [1] 10/13
straight [1] 24/17
strange [1] 26/13
Strock [2] 2/5 3/15
strong [1] 9/22
subject [4] 4/5 4/9 5/3 5/11
subpoena [6] 24/2 24/7 24/8 24/14 27/15 31/16
subpoenas [4] 22/17 22/23 23/5 31/22
substantial [2] 13/1 13/5
substitute [1] 23/21
substituted [1] 21/24
sudden [2] 28/21 28/23
suggested [1] 20/18
Suite [2] 2/3 2/7
summer [2] 4/13 4/14
super [1] 27/24
Supreme [7]
susceptible [1] 27/12
sworn [1] 11/3

T

tabs [1] 25/1
take [5] 3/20 3/23 8/13 21/9 21/11
taken [1] 7/11
takes [1] 24/11
talking [2] 8/20 17/4
Taub [2] 2/6 3/15
TCPA [4] 4/1 4/3 8/24 27/19
team [1] 7/12
technical [1] 26/21
technically [1] 28/4
technology [4] 28/19 28/20 28/21 29/1
teleconference [2] 3/2 32/13
telemarketing [1] 13/14
telephone [14]
Telephonic [1] 1/16
tell [15]
telling [1] 21/18
tells [2] 17/20 17/20
terms [1] 15/6
Texas [1] 7/7
thank [6] 5/23 11/10 30/12 32/6 32/9 32/12
Thanks [1] 32/10
theoretically [1] 9/3
think [12]
thinks [1] 27/4
third-party [25]
tied [1] 18/2
time [12]
times [1] 25/20
Title [1] 32/20
today's [1] 3/24
total [2] 8/25 9/1
totally [3] 11/14 16/22 24/1
tough [1] 8/10

T
toward [1] 4/13
tracks [1] 6/13
traction [1] 7/12
transcript [4] 1/16 1/24 3/24 32/21
tries [1] 17/15
true [2] 16/21 32/20
TUESDAY [2] 2/14 30/5
two-step [1] 14/19

U
unable [1] 29/5
unconstitutional [5] 4/18 5/2 5/5 5/7 5/12
understand [11]
Understood [1] 9/6
unfeasible [1] 9/11
unfortunately [1] 6/16
UNITED [4] 1/1 1/18 2/10 32/20
unless [6] 11/14 15/21 23/22 25/18 25/18 31/14
unrelated [1] 23/8
update [1] 31/24
us [13]
USHEALTH [35]
utilizes [1] 15/10

V
vendors [1] 19/2
verbiage [1] 17/8
verified [2] 20/13 20/19
verifies [1] 15/21
verify [2] 15/7 15/20
version [1] 28/24
versus [1] 7/17
view [1] 6/6
voice [2] 13/9 23/8
voicemail [11]
voicemails [3] 17/18 17/23 25/10
void [1] 5/5
voluntarily [1] 21/16
vs. [2] 3/6 4/14

W
wait [1] 17/7
wake [1] 26/4
week [9]
weeks [1] 31/9
whack [2] 17/8 21/25
who's [4] 3/9 3/13 3/23 5/20
win [2] 7/9 7/14
wipe [1] 8/16
wiped [1] 7/22
wise [2] 7/16 8/21
word [2] 21/10 21/12
words [4] 8/9 9/23 15/20 20/17
works [1] 28/21
world [2] 28/5 31/2
worth [1] 20/7
written [1] 8/5
wrong [2] 22/1 22/2

Y
year's [1] 20/7